On to the important business of the day, 23-2402 SYNNEXIS v. Eyenovia, Mr. Rosato, please proceed. Thank you and good morning and may it please the court. This case is an appeal from an IAPR before the PTAB and in this case the board's own fact findings here demonstrate that this case is essentially a failed inherency case. It is not a case where the petitioner and an IAPR satisfied their burden of proof as they're required to do. The issue that we're focusing on appeal here centers around the buffer limitation of the claims. Well, are you starting with whether there's substantial evidence for the board's finding or are you starting with your other argument, which I thought was that the board placed a burden on the wrong party? Which of those two are you starting with or placed the wrong burden? I think they both go together. There is an assertion here in the petition and the petition theory was that this ACORN reference disclosed this buffering limitation. The board's fact findings did not affirmatively find that it's there. What the board found was it's possible, looking at a list of ingredients, it's possible that this ingredient was buffering, it's possible that it wasn't buffering, and then the board shifted to look at patent owner's arguments and reject them. So it's an unsubstantiated charge that this limitation was in the art, is a failed inherency case as the board's fact findings and they shift. Okay, but one of your arguments as I understand them is that the board placed the burden on the wrong party. Is that correct? I think they did do that, yes. Show me, in the opinion, the place that you think most crisply demonstrates that.  I would go to, I would say the board has two parts of its analysis. First it finds a clear possibility, then at A44, that's where the board turns to addressing essentially whether patent owner proved the negative. The key issue was whether ACORN disclosed a buffer and from A41, A42, they're talking about how it's possible, depends on the parameters, there may be a buffer, and then at A44, the board then turns to the next part of its analysis, which is asking whether patent owner proved that there was no buffer. The rest of the analysis really focuses on rejecting Dr. Lasker's opinion, that was patent owner's expert, that he didn't think it was there. With those two components, even if the board, even if we were to accept the board's finding that Dr. Lasker and patent owner failed to prove the negative, it still doesn't answer the question of whether the patent owner, excuse me, the petitioner in this case, satisfied their burden of proof as they're required to do. And we would say if we turn to the first part of that, the mere possibilities, the board's fact findings there demonstrate that there was no inherent disclosure, there was no disclosure of this limitation, nobody found there was. ACORN discloses the same two phosphate salts that are recited in your Claim 7, right? You have a Claim 7 that recites these two phosphate salts as being buffering agents. And ACORN discloses those very two phosphate salts, and then they had an expert that said these particular phosphate salts are standard buffering agents. So I guess what I'm trying to figure out is why isn't that an affirmative case being made, especially when we look at your Claim 7, or your Claim 1 says a buffering agent to provide a pH from 4.8 to 6.4, and then you have a dependent claim saying the buffering agents are these two phosphate salts. Those two phosphate salts must necessarily buffer in that claim range, and then if the prior art discloses those same agents, then why isn't that a prima facie case? I'm glad you brought that up because the board does seize on that. It actually supports our argument rather than somehow exposing some inconsistency. That supports not only what we were arguing before the board, but what the board itself found. And that starts at A41. The board's talking about the concept of a buffer as not being a static thing. It entirely depends on the parameters of the solution, and you can have a situation where phosphates are present, they're not buffering, and under a different set of circumstances, they are buffering. When we get to Claim 7, and we can—again, the ultimate issue is whether ACORN discloses a buffer. So ACORN has its own pH range, this USP compliance—it asserts it's in compliance with the USP quality standards. That pH range is listed in ACORN as pH 3.5 to 6, and they confirm that they're in compliance with that. That is inconsistent with using a phosphate as a buffer. That's not true of Claim 7—the claims in the patent, which also list a pH that extends well above that same range from ACORN. So you can certainly have a narrowing dependent claim in a patent that focuses on a pH that is not present in the prior. So there's no inconsistency there. In fact, it's entirely—if there's any inconsistency, I would say it's the board's conclusion or drawing from that is inconsistent with everything they're saying at A41 about how whether an ingredient is buffering completely depends on the parameters of the solution as well as their definition of a buffer that they adopt at A14, which imparts a functional requirement that the buffer act to maintain pH. That's how it's defined, and we know from— I got a little lost in all of that. In fact, if anything, this starts to sound a lot like a substantial evidence question. We know that these phosphate salts are standard buffering agents, and I don't think you're disputing that. In fact, you can't be disputing that because your Claim 7 says that. Then we have evidence in the record that shows that these phosphate salts can be used to a buffer having a pH below 6.0, somewhere at 5.4, which is within your claimed range. And if we have a disclosed overlapping range with the claimed range, then that's good enough for meeting the claimed range limitations. So again, I don't quite follow why, based on the evidence in the record—you may have evidence on your side that favors your point of view, but if the board has other record evidence that it could rely on, to the contrary, I don't know what we can do to help you given our limited review of fact findings. I would say we can accept the board's fact findings, but I would draw one critical caveat in what you said, and that is, can be. And that is the operative word. Phosphates can be a buffer, or they cannot be. And that's a key distinction here. Again, the board explains this at A41. They're saying buffer is not a static concept. It totally depends on the parameters of the solution. So you can have phosphates in a solution, as the patent explains, that are put there not as buffers, but as tonicity adjusting agents for other reasons. They're non-buffer reasons people use phosphates. When we're looking at the ACORN reference, we have no idea what the parameters of the solution are. They've never been shown. Still to this day, nobody knows it, nor does the board. All the board says is, you need to know the parameters to conclude an ingredient's a buffer. We don't know them. And their findings that you highlight are— Can you identify for me, in the board's decision, where you take issue with the board's finding kind of this could-be language or this possibility language? Can you point me to a specific record page and the exact language they're taking issue with? Absolutely, Your Honor. That type of conditional language is littered throughout the board's decision. We see it at A41, where they're talking about the concept of a buffer being malleable. It's not static. That buffering capacity may exist. It may not. They're explaining that it depends on the parameters of the solution. At A42, they're saying phosphates may be a buffer. It's all conditional language. And we agree with that. Whether an ingredient is functioning as a buffer totally depends on the parameters of the solution. And in this case, they've never been identified. No one knows what they are under those facts. The buffer pH is a result-effective variable, right? Well, we're talking about pH. That's a different issue, right? So pH is different. And that's, you know, that was another thing I wanted to comment. Thank you for bringing that up. There's another thing I wanted to address in your comments, Your Honor, is pH is a completely different issue. The argument here in the IPR was, this is important, a very important point of this case, is their whole argument was this simplicity argument. The argument was this is a very simple case because you can simply take the ACORN solution, which they claim was the FDA-approved ophthalmic solution for atropine, and the only modification you needed to make was adjust the drug concentration. That's it. It's already buffered. So it's already buffered, and this USP compliance range satisfies the pH. So you've got the buffer. You've got the pH. They've never shown that a buffer exists. The pH we're not arguing about on appeal here. It did materialize differently as an issue, but there is a USP compliance range. We're not arguing about pH. This appeal comes down to whether a buffer is present. And as the board explains at A41, you don't know that until you know the parameters of the solution, which have never been identified. So at the end of the day, what the board's findings indicate is a mere possibility that a buffer exists, not that one necessarily exists under the well-established standard for inherent disclosure. We're left with mere possibilities, and the board explains precisely that that's the case. And then they turn to criticizing a patent owner for not proving that no buffer exists. So Counselor, I went to those pages you pointed me to, appendix page 41 and 42, and I'm not seeing the precise name language that you identified. Can you just give me maybe the line or the paragraph that you were taking issue with here? So this whole paragraph in A41 is talking about the concept of a buffer being malleable and not static. At the end of that paragraph, they conclude the evidence of record indicates that the PKA for a buffer is not static, but depends on the parameters of the solution. Above that, they talk about, a couple lines down, they're talking about some buffering capacity may exist. The top of A42, buffering range for these buffers may be as low. A43, in the last full paragraph, in the middle of the paragraph, they talk about the evidence just discussed to be able to buffer. This is all conditional language, and we agree with that. Whether something is buffering completely depends on the parameters. It's not a fixed thing. And that is precisely our point. Where we take contention is what the board did with those findings. Rather than saying, okay, under the standards of inherency, a moving party must show that an element is necessarily present. Mere possibilities aren't good enough. And what they're explaining throughout this decision is whether or not the phosphase reacting as a buffer is a mere possibility. It's not necessarily present. They never say it's necessarily present. They find a mere possibility, and then they turn over to patent owners to knock that down. But we don't see... Okay, I think you should save some time for rebuttal. Thank you, Your Honor, for reminding me. Can I ask one last question before you do that? Of course. It's a housekeeping question, right? So there are three patents at issue here on appeal. Are there any issues unique to one patent versus another patent? Not in the sense that the board's decision was essentially a cut and paste on the buffer issue. The 787 patent has more narrow and specific language about the buffer being dialed in to control pH at a stated pH range. So there's difference in the language. 787 is, I would say, a more narrow claim, but the board's reasoning is literally a copy-paste. The board's reasoning is the same across the three patents, right? That's correct, Your Honor. On this issue. Okay. Thank you. Yes. Thank you. Thank you. All right. I want to hear from opposing counsel. Mr... How do I say your name? Is it Wintner? Wintner. Mr. Wintner, please proceed. Good morning, and may it please the Court. My name is Tom Wintner on behalf of the appellee, Inovia, Inc. This isn't a failed inherency case. This is actually a relatively straightforward obviousness case. And as indicated by the patent owner in their gray brief, there really are two issues. They're both factual issues. The one issue is, what would a person of ordinary skill in the art understand that ACORN reference to have disclosed? The second issue is a motivation question. Was there sufficient motivation that was shown by the petitioner in all three of these cases? Those are all factual questions. Those are all reviewed for substantial evidence by this Court. They were all resolved in great detail by the Board in the three final written decisions. And let me just turn to sort of, you know, to the extent there's a question about what the Board was doing in its final written decision, it looked at this precise issue as a factual matter. And this is on, at Appendix 43, saying, with this record evidence in mind, we turn to what a POSA would glean from reviewing ACORN. That is the factual question. That is a quintessential question, a fact, how a POSA would understand what the reference suggests, what it teaches, what it discloses. They provide analysis following that. They provide factual findings for three or four pages. Well, I think the problem is they then say, Dr. Berg testified this. That's a factual statement. He testified to it. Where do they credit Dr. Berg's testimony and say, we agree with Dr. Berg, he has convinced us? Good question. I'd say that the best way to, or the best way to see that is if you go to their ultimate conclusion, right? Which is this, what the other side refers to, this is page 44, Appendix 44, top of Appendix 44. This is the alleged negative finding. We do not agree with Dr. Lasker's criticism that ACORN does not disclose buffers. The converse of that is that we agree that ACORN does disclose buffers. Now, where's the record evidence of that? If you look to Dr. No, I'm not sure that's right. We do not agree with Dr. Lasker's criticism that ACORN does not disclose buffers. That could be we don't agree with the reasons Lasker is giving, but not necessarily we don't agree about what is or is not disclosed. Well, I would just say if you take a look at the portions of Dr. Lasker's declaration that they're citing, and this is now at Appendix 9690, this is the section of Dr. Lasker's he says, the title of it is, Exhibit 1004 does not disclose a buffering agent to provide a pH from about 4.8 to about 6.4. In this, he then says, I've been asked to evaluate Dr. Byrne's opinion that Exhibit 1004 discloses a buffer to provide a pH from about 4.8 to 6.4. For example, Dr. Byrne repeatedly asserts, incorrectly, that's Dr. Lasker's opinion, that Exhibit 1004 discloses dibasic sodium phosphate and monobasic sodium phosphate as a buffering agent, quote, in the FDA-approved ACORN 1% atropine sulfate eyedrops to maintain a pH of 3.5 to 6.0. Where do you see that the board adopted Dr. Lasker's, or rejected, where do you see the board's finding, is what I'm trying to figure out. Where's the finding? Well, I think it's implicit in their finding, this is the whole setup. The setup is that, is the finding, if you take a look at Appendix 43, Dr. Byrne testifies that ACORN discloses standard buffering agents, including dibasic sodium phosphate, and so on, that have been shown in the evidence just discussed to be able to buffer ACORN's formulation, at least in the upper part of the cited pH range. And then the rebuttal to that from Dr. Lasker is, there's no way that is possible. That is, it is impossible for a person of ordinary skill in the art to read the ACORN reference as disclosing a buffer. That's what Dr. Byrne said, I don't believe it, and the reason I don't believe it is because of this pH rule in Waterman, and that was completely discredited by the board, by no less than five references, and by Claim 7 of the 787 patent itself. So that's where the evidence is. There's even additional evidence with respect to buffering that exists in the Condritzer reference itself, which is another one of the grounds. This is at Appendix 18, the Condritzer reference. And where does the board reference this? Where does the board reference this? Yeah. This is Appendix 18, in the final written decision. This is a direct quote from, I think, the second page of the Condritzer reference, which is a very old chemistry paper. Quote, this is now the last sentence in the first paragraph, about eight lines down. Quote, the preservation of aqueous atropine solutions by buffering at pH 4 to 5 has been recommended. So the notion that you couldn't have a buffer in connection with an atropine solution, and in particular with an atropine ophthalmic solution, that's the Remington formulator's bible, just doesn't add up. Can we follow up on Chief Judge Moore's question? Are you relying on the bottom of page 43, partially, to see where you think the board was summarizing its findings, and maybe potentially correcting Dr. Burns' testimony? Yes. I think if you look at the bottom of 43, there's the one sentence that I read that says what Dr. Burns testifies. So that's an example of them crediting Dr. Burns and his testimony from two paragraphs of his expert declaration. And then they go on to say that they disagree with Dr. Lasker. And this is, to me, a classic weighing of the evidence as between experts that shouldn't be overturned on substantial review. If there are no further questions, does the board want to hear anything about the motivation question? Or if not, I feel... So Board Judge Chen, do you want to hear anything? Need to hear anything? No. Okay. No, I think we're good. Thanks. All right. Thank you, Your Honor. Thank you.  I have a minute? Yes. Yeah. Okay. I'll be brief. So one thing I want to respond to, and also make sure is clear, it's really important, obviously, in an IPR petition to understand the argument that was made. And the argument was very much centered in the IPR petition about this alleged simplicity, that there are no modifications that need to be made to this existing FDA product other than changing the drug concentration. That's important for a couple reasons. One is this idea, looking at the board's findings, we point... Counsel pointed to the portion where the board is talking about what they glean from the reference. So if an element is so clearly disclosed in a reference, why is the board spending pages and pages and pages trying to figure out what they can glean from a reference? There is no affirmative findings based on Dr. Byrne other than possibilities. And in terms of the Kondritzer, no argument was made to modify ACORN in view of Kondritzer. It's a 1950s reference where this is a drug used by the military for nerve gas treatment. Those aren't ophthalmic solutions. And it's not an accurate characterization. But it's an argument never made. Any questions? Otherwise, I'll... Okay. Thank you. Thank you. We'll take this case under submission.